S & W AGENCY, INC., d/b/a Farm and City Insurance Services, and Gaylord Wooge, Plaintiffs,

v.

FOREMOST INSURANCE COMPANY, Foremost County Mutual Insurance Company, American Federation Insurance Company, and George H. Shattuck, Defendants.

No. C92–3071.

United States District Court, N.D. Iowa, Central Division.

Jan. 21, 1998.

Philip D. Brooks, Chris J. Scheldrup, Moyer Bergman, Cedar Rapids, IA, for Plaintiff.

David A. Hacker, Stephen J. Holtman, James R. Snyder, Simmons, Perrine, Albright, Ellwood, Cedar Rapids, IA, Philip J. Loree, Jr., Clifford H. Schoenberg, Rosenman & Colin LLP, New York, NY, for Defendant.

## ORDER

JARVEY, United States Magistrate Judge.

This matter comes before the court pursuant to trial on the merits of plaintiffs' claims for punitive damages against the defendants. By order dated July 3, 1997, this court set aside a November 1995 jury verdict for punitive damages against the defendants. The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge and waived their jury demand on the retrial of punitive damages issue.

The jury in the first trial found that Foremost Insurance Company had breached an oral agreement with the plaintiffs. It further found that Foremost had fraudulently misrepresented (1) its commitment to a long-term relationship with Mr. Wooge, (2) its commitment to give Wooge an exclusive marketing arrangement with

recreational vehicle associations, and (3) its commitment to have Mr. Wooge be the exclusive marketer of an insurance endorsement that he created. The jury further found fraudulent nondisclosure and misappropriation of trade secrets. Finally, the jury found intentional interference with existing contractual relations. The jury found that defendant George Shattuck intentionally interfered with plaintiff's existing contractual relations, that he made fraudulent misrepresentations and misappropriated trade secrets. The jury awarded $688,000 in compensatory damages and $8 million in punitive damages against Foremost and $12,000 in punitive damages against George Shattuck.

The court set aside the award of punitive damages on the defendant's post-judgment motion. The court found that the jury had improperly been instructed that punitive damages could be awarded on the Trade Secrets Act count. Because the court could not tell whether the jury might possibly have only awarded punitive damages on the Trade Secrets Act count, the court believed that the verdict was impermissibly general as it pertained to the finding of punitive damages. Accordingly, the court set the case for retrial on the issue of punitive damages.

Trial was held from December 8, 1997, until December 12, 1997 (the second trial). The plaintiffs were represented by Kevin Visser, Chris Scheldrup, and Paul Gamez. The defendants were represented by Stephen Holtman, David Hacker, and Leonard Strand. The court finds in favor of the plaintiffs and against defendant Foremost Insurance Company and awards punitive damages in the amount of $4 million.

## FINDINGS OF FACT

Plaintiff Farm And City Insurance Services is an independent insurance agency [1] located in Forrest City, Iowa. It is owned by plaintiff Gaylord Wooge. It specializes in selling insurance for recreational vehicles. The defendant Foremost Insurance Company is a Michigan corporation with its principal place of business in Grand Rapids, Michigan. Among other things, it specializes in underwriting motor home and mobile home insurance. Defendant George Shattuck is a senior vice-president with Foremost Insurance Company employed in a marketing capacity.

In 1982, Gaylord Wooge approached Foremost Insurance Company with a novel idea for a new insurance product. Wooge grew up and lived in the town where Winnebago Industries, the world's second largest recreational vehicle manufacturer, has its principal place of business. Wooge learned much about recreational vehicles from his association with Winnebago Industries and another manufacturer of recreational vehicles and also learned much about the unique demographics and desires of recreational vehicle owners. Wooge knew that RV owners were typically older and therefore more careful and conservative drivers. He also knew that the Winnebago product was extremely well built. He believed that the recreational vehicle customer would want to purchase an endorsement providing a replacement recreational vehicle in the event that the owner's vehicle was somehow totaled. He also believed that the nature of the recreational vehicle driver and the quality of the Winnebago product would mean that losses under the policy would be relatively infrequent.

Wooge's idea for this insurance product did not stop with his idea. Through his contacts at Winnebago, Wooge was able to secure an unprecedented agreement with Winnebago under which Winnebago would

---

1. An independent insurance agency has the ability to sell insurance for any number of competing insurance companies. The independent agent is different from the "captive" agent who only writes policies for one company such as Allstate Insurance Company or State Farm Insurance Company. One of the most important distinctions between independent and captive agents for the purposes of this case is that an independent agent owns the expirations or renewals which is the right to contact and solicit the customer at the termination of the policy.

provide the replacement cost recreational vehicle at just slightly above the manufacturer's cost. With this agreement, everyone won. The insurance customer got attractively priced protection against the threat of a recreational vehicle catastrophe. Winnebago retained a customer where there would otherwise be no assurance that the insured would take his or her insurance check and buy another manufacturer's product. Wooge received a commission and Foremost made a profit.

The endorsement was presented by Wooge through Foremost employee James Malnight. Malnight knew little about the characteristics of RV owners other than basic underwriting information concerning their age and gender. He knew very little about the RV associations. Malnight understood Wooge's need for a long-term relationship and assured Wooge that such would be the case.

The product was ultimately referred to within Foremost as the "Wooge" or "WIT" [2] endorsement. The product became very successful. Wooge's agency became one of Foremost's two largest marketers of insurance. Although the Foremost Insurance Company uses 5% as a target figure for underwriting profit, the Wooge or WIT endorsement yielded at 10% underwriting profit.[3]

Wooge also designed the successful marketing strategy for this unique product. Most manufacturers of motor homes sponsor a motor home association. These associations sponsor rallies across the country at which large numbers of their members gather for recreation. Wooge studied the WIT association extensively and learned about their rallies. Before attending the rallies, he secured the exclusive endorsement of the RV manufacturer's association so that only he could market insurance products at the rally. Wooge then attended seven to eight rallies per year between 1983 and 1988 setting up a Foremost Insurance Company booth. He expended

between $8,000 and $10,000 per rally to attend and engaged in promotional activities including giving insurance seminars and scooping free ice cream to attract customers to his booth. He would then offer Foremost Insurance products which were unique largely because of his replacement cost endorsement.

At trial, Foremost claimed that there was really nothing unique about this product or the information that it was getting from Mr. Wooge. The company obviously knew about replacement cost insurance products and had marketed insurance through associations or "affinity groups" in the past. However, it was precisely because of Mr. Wooge's expertise that the endorsement worked for motor homes. George Shattuck knew this in 1984. (Plaintiff's Exhibit, p. 2). See also Plaintiff's Exhibit 7.

In July of 1991, John Leja at Foremost called the WIT endorsement the only RV insurance product enhancement of any consequence in the past fifteen years at Foremost. (Exhibit 32, p. 4). Further, all of the top executives of Foremost in the recreational vehicle insurance area asked for opportunities to go to Forrest City, Iowa, to tour the Winnebago plant with Mr. Wooge and to meet officers at the WIT club. They then expressed gratitude to Mr. Wooge for what they had learned on these trips. Even after Foremost began competing with Mr. Wooge for the endorsement of these RV associations, it was unable to get the endorsement of any of them without Gaylord Wooge.

Because of the success in marketing RV insurance through the WIT association, Wooge decided in 1987 and 1988 to explore the possibility of taking this product to other manufacturer associations. He was concerned that the expansion of his plan might offend his friends at WIT. He was also concerned about the risk and substan-

---

**2.** WIT stands for Winnebago Itaska Travelers, Winnebago's manufacturer-sponsored association of recreational vehicle owners.

**3.** Plaintiff's expert believed the profit was much greater. (TR. 184).

tial expense in attempting to generate this additional business.

The president of the WIT club, John Morris, agreed that WIT would not object to Wooge's plan. In fact, Mr. Wooge attended a November 1988 recreational vehicle association directors' meeting in Louisville, Kentucky, with John Morris. At this meeting, Wooge had an opportunity to be introduced to the directors of all of the other recreational vehicle associations at one time. Foremost knew about it because Wooge had told them in June of 1988. In fact, the people at Foremost were excited about Wooge's attendance at that meeting.

Foremost learned about the interest generated at the meeting when Wooge told them about it at his December 1988 annual review at Foremost. Wooge informed Foremost of the investment that he would make to attempt to capture the business of these other manufacturer associations.

In April of 1989 he discussed these efforts again with management at Foremost. Wooge expressed concern at that meeting that a product being marketed by Foremost to the American Association of Retired Persons (AARP) might compete with his exclusive right to market the WIT endorsement. He was assured that the AARP product would not be in competition with him.

Wooge again was invited to the 1989 recreational vehicle association directors' meeting. He was not permitted to make a sales presentation so he brought no promotional materials with him. However, the various RV association directors expressed tremendous interest in establishing a relationship between their associations and Wooge. This information was again taken to Foremost in December of 1989 where Wooge informed Foremost officials that he would be going to the Holiday Rambler, Coachman, and Allegro RV associations to secure the right to exclusively market the WIT endorsement to their members. Again, Foremost was excited about Wooge's efforts and encouraged him to attempt to repeat his exclusive

arrangement with these other manufacturer associations.

Shortly thereafter, in February of 1990, Wooge went to meet with officers at Holiday Rambler. He was surprised and angered by the fact that representatives of Foremost Insurance Company had already approached Holiday Rambler seeking to get its endorsement for the replacement cost insurance. Wooge then flew directly to Foremost's headquarters and was assured by Steven Field that Foremost's approach to Holiday Rambler had been a mistake, that it was another "arm" of Foremost that had approached Holiday Rambler, and that Foremost should not have been there. Foremost's executive vice-president, Jack Hannigan, was present for this meeting.

Early in 1990, the status of Foremost's efforts to market recreational vehicle insurance were discussed at the highest levels of the company. According to Mr. Shattuck, he was selected by Richard Antonini, the president of Foremost Insurance Company to head up a new marketing strategy for recreational vehicle insurance. This directive was announced to employees on March 21, 1990. (Plaintiffs' Exhibit 88). Mr. Shattuck then began studying the recreational vehicle side of Foremost Insurance business as Shattuck had previously devoted his efforts on the mobile home side of Foremost's business.

Very shortly after undertaking his new role, Mr. Shattuck went to Forrest City, Iowa, to meet Gaylord Wooge and learn more about Wooge's successful idea. In a follow-up letter to Mr. Wooge, Mr. Shattuck asked for more information concerning Wooge's current WIT members and the current motor home policy in force run. Mr. Shattuck and Mr. Wooge discussed the problem that had occurred in February of 1990 at the Holiday Rambler Association but reinforced Foremost's commitment to Wooge's earlier identified marketing plan. In Mr. Shattuck's words he encouraged Wooge to "Keep on doing

what you're doing." Again, Shattuck reinforced a commitment made to Mr. Wooge at that meeting calling him a "long-term key player" and stating:

> Again, we wish to emphasize our partnership position as Farm & City can have a major role in the long-range development of the motor home and travel trailer lines.

(Plaintiff's Exhibit 19).

Three days after writing his letter to Mr. Wooge, Mr. Shattuck unveiled internally his initiative referred to in the two trials before this court as the "RV initiative" or the "Shattuck initiative." The initiative begins with references to beginning with a "slate" that is clean and fresh. In part, the court finds that this is simply a reference to Mr. Shattuck's perspective and desire to generate new thinking. Because of other events in the following months, the court also finds that it also represents Mr. Shattuck's lack of interest in commitments made by other Foremost executives to Mr. Wooge in preceding years. The cornerstone of this new initiative would be the formation of a new company to market insurance directly from the company to the insured, thereby avoiding premiums paid to independent agents such as Mr. Wooge. *See* Exhibit 20 at ¶ 8. Mr. Shattuck envisioned that the fruits of this initiative would not be realized until sometime in 1992 knowing that it would take time to set up this new channel of distribution.

Later in the year John Leja, a critical member of Mr. Shattuck's new initiative, recorded more details of the RV association marketing plan. According to Mr. Leja's memorandum, the objective of the new RV initiative would be to develop fifteen to twenty-five million dollars in motor home and travel trailer premiums by marketing through RV associations on a direct response basis. (Plaintiff's Exhibit 114, p. 3). To achieve this objective, it was proposed that Foremost would obtain the endorsement of RV associations and specifically targeted the WIT club among five others. Wooge had been given the exclusive right to market his endorsement to WIT. The initiative was simply Mr. Wooge's idea without Mr. Wooge.

In June of 1990, Mr. Shattuck again visited Mr. Wooge in Forrest City. Mr. Wooge took Mr. Shattuck to a WIT rally where Mr. Shattuck learned a lot about customer needs and wants as well as the unique characteristics of the insurance customer. (Plaintiff's Exhibit 30). In a follow-up letter describing his new initiative, Mr. Shattuck told Mr. Wooge "Foremost will own the rights to renewals." Under Shattuck's proposal, Mr. Wooge would no longer have the exclusive right to market through the manufacturer's association. Foremost would have the contract with the manufacturer's association that Mr. Wooge had already secured. Mr. Wooge, however, would still get to attend the rallies. Instead of receiving a commission on new business of 30% of the premium paid and renewal business premium of 15% of the premium, Mr. Wooge would now get a commission of 8% on new business and 6% on renewal business. Wooge had justifiably relied on Foremost's representations of a long-term exclusive arrangement and had spent large sums of money to develop this business. Foremost looked at the situation mid-stream and simply decided that Wooge made too much money.

According to the testimony of Mr. Shattuck and Executive Vice–President Jack Hannigan, this change was going to be a great opportunity for Mr. Wooge. Despite the fact that a typical commission on a new motor home insurance policy would go from $180 down to $40, they claimed Mr. Wooge would make more money because of the increased business that he would receive and the decreased expenses. There was no credible projection that Wooge, who was already getting good market penetration at WIT, was going to get five times more business.

The proposal to Mr. Wooge was not intended as an offer of some great new business opportunity. It was a repudiation of Foremost's earlier commitments to

Mr. Wooge and a strong-arm threat to try and cause Mr. Wooge to capitulate and let Foremost own his renewals. This is made extremely clear by the last paragraph on page two of the letter where Mr. Shattuck tells Mr. Wooge that because they will price the direct product cheaper than the independent agent product, it would "create a problem for your agency." Still, executives at Foremost claim that the RV initiative was never designed to compete with Wooge.

Further, despite the fact that Foremost told Wooge that part of the incentive to accept a 22% smaller commission on new business was the fact that Foremost would absorb a lot more of Wooge's overhead expenses, Shattuck asked Wooge in his letter, "Do you have sufficient staff to handle the additional workload?" The claim that Wooge was going to make more money cannot be believed.

Finally and most indicative of Shattuck's true concerns, he stated in his letter

> Last, but not least, the overwhelming question from our organization is, what is it that you do for the commission that we pay?

This concern about how much money Mr. Wooge was making is reflected in other places in the evidence. John Leja described the strengths and weaknesses involved in having Wooge as a part of the marketing of RV insurance. In describing Wooge's strengths, Leja stated, "Got the knowledge—experience—especially motorized. Seems to be committed to going to rallies. Already doing it." Then, in describing the weaknesses of including Wooge in the marketing plan, Leja lists as two of the first three weaknesses that Wooge owns renewals and was paid high commissions. Leja's notes conclude, "We have to own the renewals. He would use leverage against us. Maybe there is a role for him." (Plaintiff's Exhibit 18). Thus, the new marketing initiative was designed to write insurance directly to a customer, target business already secured by Wooge, drastically cut his commissions and own his renewals.

Further insight into the intentions of Foremost can be gleaned from a memorandum written by John Leja to Jack Hannigan and George Shattuck on November 19, 1990. In this memo, Mr. Leja assesses the potential damage to Foremost if Mr. Wooge were to take his book of business to another insurance company. The events of the first six months of 1990 caused Wooge to be concerned about whether Foremost would honor its commitment to a long-term relationship and exclusive marketing to recreational vehicle associations. After describing Wooge as a "nuisance factor," Leja suggests that Wooge could continue to be a benefit to Foremost if they were able to maintain a good relationship with him. However, Leja made it clear that the kind of relationship that he would suggest is not the kind that Foremost presently had with Wooge and the WIT club. Leja stated

> In this case, it appears that Gaylord holds most of the cards, owns the business, has the contacts, etc. I would suggest that we approach Gaylord one more time and offer him some sort of override where he would perform a variety of marketing and merchandising functions, but not agent functions. This would be a function similar to what John Miller performs for Thousand Trails. Gaylord would attend rallies and meetings of various manufacturer clubs, host seminars and man information booths and distribute information. We would write the business on a direct basis through FPS, and we would own the business.

(Plaintiffs' Exhibit 24, p. 2).

Leja's desire to cancel Wooge's agency contract was made very clear in this same November 19, 1990, letter. In Leja's words

> If Gaylord is reluctant to enter into such a relationship with Foremost, then I would suggest that we cancel his contract for new business.

George Shattuck and Leja seriously entertained canceling Wooge's agency on a

number of other occasions during 1990 and 1991. None of these intentions were ever expressed to Foremost's long-term key player, Gaylord Wooge. He was strung along with assurances of the status quo until Foremost was in position to internally capture the business in 1992.

Also, in describing the RV initiative in an undated 1990 document, Leja wrote, "A typically long-term and satisfactory relationship between a customer and the agent must be broken. To do so, product must be very appealing in both product features and price." While Leja testified that the reference to the relationship between customer and agent was a reference to agents of State Farm, Allstate, and other "captive" agents, the court does not believe this especially in light of Leja's obvious hostility toward Wooge, the fact that Wooge owned renewals, got high commissions, and held "most of the cards."

Following George Shattuck's June 1990 communication, Gaylord Wooge sought the advice of an industry consultant, William Vericker. Upon learning in July 1990 that Wooge had hired a consultant, George Shattuck was furious. Although Vericker made a proposal to Shattuck for a new contractual understanding, no one at Foremost responded to Wooge until they met with Wooge in December 1990 at Wooge's place of business. Mr. Shattuck now testifies that he does not know why he did not respond to Mr. Wooge's proposal and that he simply "dropped the ball." The ball was not dropped. Shattuck even sent the proposal to the legal department who said that the proposal was a "major barrier" to getting what Foremost wanted. (Exhibit 22). New proposals were made but the company did not back down from its insistence upon owning renewals or purchasing them cheaply from Mr. Wooge.[4] In this proposal for a new contractual arrangement, Mr. Shattuck suggested that, upon termination of the agency, Foremost would be able to solicit any members of clubs with whom Wooge had exclusive arrangements and would be allowed to purchase Mr. Wooge's renewals for "one times commission." On average, the renewals were worth many times the commission.

Throughout 1991, Foremost became increasingly upset because they thought that Mr. Wooge was attempting to move his book of business to Progressive Insurance Company. Mr. Wooge had threatened to do so and in fact placed business with Progressive for recreational vehicle insurance that Foremost was unwilling to write, i.e., fifth wheel and travel trailer business. Still, Wooge was attempting to get some reaffirmation of Foremost's commitment to his agency. At the end of January 1991 Foremost sent the plaintiff a proposal with that thought in mind. (Plaintiff's Exhibit 26). Wooge responded a week later believing that he and Foremost were patching up the differences that they had suffered in the prior eight months. (Exhibit 25). However, on February 8, 1991, the RV group at Foremost met. Jan Slotten was a member of the team in charge of a department at Foremost known as FPS.[5] This group managed house accounts acquired from agency terminations or purchases from agencies or dealers. In her notes she reflects that the upshot of the February 8, 1991, RV initiative meeting was that it looked as though Gaylord Wooge's agency was going to be canceled and that it would slow down the group's attempt to acquire RV association business.

Mr. Shattuck and Mr. Wooge continued to correspond throughout 1991. Wooge was signing up manufacturer association groups which continued to frustrate, irritate and upset Leja and Shattuck. Meanwhile, the plans for direct marketing of RV insurance continued. Foremost assigned Sarah Gutek to head up the company called American Federation that would actually sell the Foremost policy. Very

---

4. *See,* for example, Plaintiffs' Exhibit 26, a January 28, 1991, letter to Gaylord Wooge from George Shattuck.

5. FPS stands for Foremost Policyholders Service.

shortly after she was on board, she also was taken to Forrest City, Iowa, to meet Gaylord Wooge, get the tour of Winnebago and learn about the marketing of recreational vehicle insurance. No one told Gaylord Wooge that Ms. Gutek would be his new competitor. He apparently embarrassed himself by displaying his assumption that she was not an important visitor as he offered to have one of the women who works for him take Ms. Slotten back to his office while an important meeting between Wooge and Foremost officials was to take place.

The correspondence from Foremost continued to reinforce Foremost's commitment to Mr. Wooge in the summer of 1991. Meanwhile, Ms. Gutek was charged with conducting an analysis of Mr. Wooge's accounts to determine whether Wooge was placing any of his Foremost policyholders with Progressive Insurance Company. Mr. Hannigan testified that Mr. Shattuck repeatedly suggested terminating Wooge's contract in 1991 and 1992 because of the situation with Progressive Insurance but that Mr. Hannigan rejected these suggestions.[6]

In June 1992 Gaylord Wooge was notified by George Shattuck that his agency contract had been terminated. The decision was made by Mr. Hannigan in February 1992.[7] Jack Hannigan made the ultimate decision to terminate the agency agreement and testified that he did so because Wooge was badmouthing Foremost and misrepresenting its position to Foremost employees and in the marketplace. When pressed, he was short on specific (TR. 1600–1611) instances of such conduct and none of them predated February 1992. He also said that he did this because Wooge was inappropriately making calls to the American Federation office seeking to obtain quotes for recreational vehicle insurance. Wooge simply called and asked for quotes. It was neither dishonest nor improper. However, George Shattuck's November 1992 deposition testimony proves that it was Wooge's refusal to give up his expirations and accept a lower commission that caused the termination of his agency. Leja told Jan Slotten that Wooge was terminated for not taking lower commissions. (TR. 1895–6).

In sum, Foremost's explanations as to when and why it decided to terminate plaintiff's insurance agency are a confusing group of inconsistent excuses. The real reasons were (1) those in power in the 1990s were upset about how much was given to Wooge in the 1980s but had to keep him on board until they could more effectively compete with him, (2) Mr. Shattuck was under pressure to come up with something new and more profitable but Mr. Wooge's relationship with Foremost and the RV associations made Shattuck's idea difficult to successfully pursue, (3) Wooge had successfully signed up manufacturer associations that Foremost was unable to get, and (4) Wooge had leverage against Foremost because he owned the renewals to the business.

At the retrial, Mr. Hannigan's testimony blamed Mr. Wooge for not making efforts to repair the situation after he had received written notice of his cancellation. However, Wooge proved that he immediately wrote to Foremost and attempted to set up a meeting which was rejected by Foremost. Shattuck hung up the phone when Wooge called.

The effect on Wooge's business was devastating. All of his customers received notices that their policies would not be renewed. His phone rang off the hook with elderly clients concerned that he had been engaged in some sort of misconduct.

---

6. Wooge had told Foremost that he might move business to Progressive and one of Foremost's proposals acknowledged it and simply demanded that Foremost be the recipient of a majority of Wooge's business. Again, Mr. Hannigan adamantly denies that the threat of Mr. Wooge moving some of his business to a different insurance company had anything to do with the termination of Wooge's agency.

7. He so testified at his deposition but now claims the decision was made later.

The simplest day-to-day business between an agent and the company became difficult to accomplish because of Foremost's inaction. A huge percentage of his business went away.

Wooge tried to find another insurance company to which his book of business could be transferred. Ultimately, he found American Bankers Insurance in Miami, Florida. When such an event happens, the insurance companies engage in a typically quick set of negotiations to determine a price for the business transferred that allows the new company to profit on the risk assumed by it. An internal memorandum from Foremost and the testimony of an insurance expert show that this commission to be paid by American Bankers was set so arbitrarily high that the transfer could not take place in a workable amount of time. In the words of a Foremost officer, "Let them chew on that." *See* Exhibit 138, testimony of Emmett Vaughn.

Just days after the effective date of the termination of plaintiff's agency, Foremost sent letters to recreational vehicle manufacturers [8] informing them of their decision to terminate the plaintiff's agency agreement. An example is the letter to Winnebago Industries sent November 3, 1992. (Plaintiff's Exhibit 38). In extolling the benefits of the agreement, Sarah Gutek emphasized that the winners in the agreement would be Winnebago, its dealer, and its customer and "Foremost, who will retain a customer who was very satisfied with our service."

This letter shows Foremost's intention to acquire the business that Mr. Wooge had generated. Ostensibly, the letter was an attempt to continue the agreement Wooge secured whereby Winnebago provided the replacement cost vehicles at slightly above cost. However, such a letter was unnecessary as Mr. Shattuck had already received the equivalent of an assignment of Mr. Wooge's agreement with

Winnebago to provide the replacement cost vehicles. *See* (Defendant's Exhibit N–7). The terms of that agreement specifically stated that "the parties agree that these provisions shall survive the termination of any Agency Contract."

Furthermore, Foremost had a policy that it would not directly solicit the customer of a terminated agent for a period of two years. This policy was in effect through October of 1992 but changed on the effective date of Mr. Wooge's termination to provide that Foremost would only avoid direct solicitation for a period of six months. (Jan Slotten deposition testimony at p. 195–6).

### CONCLUSIONS OF LAW

#### Punitive Damages

In Iowa, punitive damages are recoverable in order to "punish the party against whom they are awarded and to deter others from similar wrongdoing." *Grefe v. Ross,* 231 N.W.2d 863, 868 (Iowa 1975). Punitive damages may be awarded for both fraud and tortious interference with contractual relationships. *See C. Mac Chambers Co. v. Iowa Tae Kwon Do Academy, Inc.,* 412 N.W.2d 593, 599 (Iowa 1987) (fraud); *Westway Trading Corp. v. River Terminal Corp.,* 314 N.W.2d 398, 404 (Iowa 1982) (tortious interference with contractual relationships). To support an award of punitive damages, a tort must be committed with either actual or legal malice. *Parks v. City of Marshalltown,* 440 N.W.2d 377, 379 (Iowa 1989). Actual malice may be shown by such things as personal spite, hatred, or ill-will. *Id.* Legal malice may be shown by wrongful conduct committed with a willful or reckless disregard for the rights of another. *Id.* A plaintiff seeking punitive damages must prove malice by a preponderance of clear, convincing, and satisfactory evidence. Iowa Code § 668A.1(1)(a); *Hockenberg*

---

8. The manufacturers control their associations with whom Wooge had exclusive relationships.

*Equip. Co. v. Hockenberg's Equip. & Supply Co.,* 510 N.W.2d 153, 156 (Iowa 1993).

■ In deciding on the amount of a punitive damage award, a court applying Iowa law should consider traditional factors such as: (1) the extent and nature of the outrageous conduct; (2) the amount necessary for future deterrence; and (3) the relationship between the punitive award and the plaintiff's injury, as reflected in any award for compensatory damages. *See Jones v. Lake Park Care Center, Inc.,* 569 N.W.2d 369, 378 (Iowa 1997) (quoting *Ezzone v. Riccardi,* 525 N.W.2d 388, 399 (Iowa 1994)). In addition, the court should consider "all circumstances surrounding the conduct and relationship between the parties" and "any provocation of the [defendant's] conduct by the plaintiff." *Ezzone,* 525 N.W.2d at 399. Iowa courts have defined provocation to include participation in the conduct complained of. *Id.*

■ A court must also review a punitive damage award according to the reasonableness standards of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. 1, 17, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). In calculating punitive damages, the Supreme Court has observed that it is appropriate to consider "whether there is a reasonable relationship between the punitive damages award and the harm likely to result from defendant's conduct as well as the harm that actually occurred." *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 460, 113 S.Ct. 2711, 2721, 125 L.Ed.2d 366, 381 (1993). The Court has also stated that "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 570, 116 S.Ct. 1589, 1599, 134 L.Ed.2d 809, 826 (1996).

### Trade Secrets

The jury in the first trial made a number of findings on the issue of trade secrets. First, the jury found that three different categories of information owned by the plaintiffs qualified as "trade secrets" under § 550.2(4) of the Iowa Uniform Trade Secrets Act (IUTSA). Those three categories included: (1) information concerning the plaintiffs' customers; (2) information regarding the underlying agreement with RV manufacturers that was part of the "WIT" or "Wooge" endorsement; and (3) information regarding the unique characteristics of RV owners and the RV marketplace. The jury also found that Foremost's and Shattuck's actions regarding the plaintiffs' trade secrets constituted "misappropriation" under § 550.2(3) of the IUTSA.

■ Section 550.4(2) of the IUTSA authorizes exemplary damages of up to twice the amount of the compensatory damages if the defendant's actions constitute "willful and malicious misappropriation." Iowa Code Ann. § 550.4(2) (West 1997). The decision whether to award exemplary damages is an issue left up to the discretion of the court. *205 Corp. v. Brandow,* 517 N.W.2d 548, 553 (Iowa 1994).

The jury in the first trial found in favor of the plaintiffs on all of their theories of recovery. However, this court believes that the essence of the plaintiffs' claims is contained within the fraud count. The jury found all of the elements of fraud to exist and found three separate instances of fraudulent conduct. The fraudulent representations were made on a number of occasions from 1990 through 1992. The finding of fraud is based on Foremost's 1990s management representing the security of a long-term relationship and exclusivity while actively planning the termination of his agency, knowing that Wooge's success was inconsistent with Foremost's new marketing plan.

■ The problem with Foremost's 1990 plan was that it started with a clean slate when, in fact, the slate was not clean at all. The Foremost plan could not work well with Wooge in place because, in fact,

Wooge had been given exclusive right to market his replacement cost endorsement. More importantly, Wooge was the only one who could get a recreational vehicle association to endorse the Foremost insurance product. Further, it was Wooge who got the original agreement with the Winnebago club to provide the replacement cost vehicle. Finally, the Foremost plan would not work with Wooge because they promised him higher commissions and Wooge got to own the expirations. The combination of these factors was inconsistent with a successful Foremost plan. Proposals to terminate Wooge surfaced repeatedly in 1990 and 1991 without telling him. Assurances to Wooge that Foremost would not compete with him were disregarded as Foremost began secretly competing to market to associations and to bring the American Federation product on line. Finally, the American Federation product came on line as scheduled in 1992 and Wooge who "held all the cards" was simply taken out of the game. This court believes that Foremost's actions were reprehensible and constitute actual malice proven by the preponderance of clear, convincing and satisfactory evidence. Its actions with respect to the American Bankers assumption of Wooge's book of business, its unnecessary contact with Winnebago, and its post-termination efforts to solicit Wooge's clients show an intent to injure Mr. Wooge.

The court has considered the nature of the defendants' conduct, the money that Foremost made with Mr. Wooge's help, the actual harm Wooge suffered, and the need for deterrence. The court concludes that it is appropriate to award punitive damages in the amount of $4 million.

The court has determined that the punitive damages should be awarded against Foremost Insurance Company only and awards them on the fraud claim for the reason expressed above, that the fraud claim captures the essence of the wrong that was committed here. Because the $4 million appropriately addresses the essence of the harm and is an appropriate amount of money, the court declines to order liquidated or exemplary damages on the Trade Secrets Act count. The court would have ordered twice the compensatory damages as exemplary damages on the Trade Secrets Act count had it been the only legal theory under the court's consideration. The court declines to order punitive damages against George Shattuck personally as (1) a finding of fraud against Mr. Shattuck personally has a punitive element to it, and (2) the court believes that Foremost would pay it for him anyway.

Upon the foregoing,

IT IS ORDERED

That the Clerk of Court for the Northern District of Iowa shall file an amended judgment in favor of the plaintiffs and against Foremost Insurance Company in the amount of Four Million Dollars ($4,000,000) for punitive damages.